IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DALETH URRUTIA,

    Plaintiff,

v.	No. 16-cv-25-MCA-SCY

CLAYTON THOMAS MONTOYA
and CITY OF CLAYTON,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendant Town of Clayton's Motion for Summary Judgment*, filed May 9, 2016. [Doc. 23] The Court has considered the parties' submissions, the relevant law, and the record and is otherwise fully advised.

**Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. An issue is "genuine" when the evidence before the Court is such that a reasonable jury could return a verdict in favor of the nonmovant as to that issue. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248-52 (1986). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id.* at 248. Judgment is appropriate as a matter of law if the nonmovant has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S.

1

317, 322-23 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998).

It is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Rather, the Court assumes the admissible evidence of the nonmovant to be true, resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *Hunt v. Cromartie*, 526 U.S. 541, 551-52 (1999).

**BACKGROUND**

This lawsuit arises out of allegations that Defendant Clayton Montoya, who was then employed by the Clayton Police Department, falsely imprisoned and battered then seventeen-year-old Plaintiff. [Doc. 37] In relevant part, Plaintiff's lawsuit seeks to hold the Town of Clayton (the Town) liable Mr. Montoya's alleged tortious acts under the New Mexico Tort Claims Act. [Doc. 37 p. 6-7] Plaintiff's claims against the Town are premised on her theory that Mr. Montoya committed the alleged acts while acting within the scope of his duty as an employee of the Town. [Doc. 37 p. 6-7] The Town and Plaintiff agree that the following facts are undisputed.[1]

Mr. Montoya was hired by the Clayton Police Department as a police officer recruit in January 2015. [Doc. 23 ¶ 1; Doc. 23-2 ¶ 5] Mr. Montoya was hired on a

---

[1] Mr. Montoya has not joined in the Town's Motion, and the Court does not assume that he agrees that the facts discussed herein are undisputed.

twelve-month probationary period during which he could perform police work for the Town of Clayton only under the direct and constant supervision of a field training officer or experienced officer.  [Doc. 23-2 ¶ 11; Doc. 23 ¶¶ 2-3]

On April 8, 2015, the day of the events that gave rise to this lawsuit, Mr. Montoya went to the Urrutia Café at around 6:00 or 6:30 p.m.  [Doc. 23 ¶ 5; Doc. 23-4 p. 19]  Mr. Montoya drove himself to the Urrutia Café in his police vehicle; he was dressed in his full police uniform; he was equipped with his Taser and his gun; and he was "displaying his official badge of office."  [Doc. 25 ¶¶ B-C, H, M; Doc. 25-1 p. 5]

Mr. Montoya had not been dispatched to the Urrutia Café nor had he been otherwise directed there by the Clayton Police Department.  [Doc. 23 ¶ 8; Doc. 23-2 ¶¶ 16-18]  Further, Mr. Montoya, whose working hours were designated by a written schedule, and tracked by a time card, was not scheduled to be on duty until 8 p.m.  [Doc. 23 ¶ 7; Doc. 23-2 ¶ 13-14]  Clayton Police are required to "[r]emain in radio contact at all times when on duty and inform the communications operator when [they are] out of service or out of the vehicle."  [Doc. 23-5 p. 4]  On April 8, 2015, Mr. Montoya did not report that he was "in service" until 7:59 p.m.  [Doc. 23 ¶ 9; Doc. 23-2 ¶ 15]

Mr. Montoya's cousin was Plaintiff's best friend; and Plaintiff was also friends with Mr. Montoya.  [Doc. 23-4 p. 3-5]  The Urrutia Café is owned by Plaintiff's family, and Plaintiff was working there alone when Mr. Montoya arrived.  [Doc. 37 ¶ 9; Doc. 23-4 p. 19; Doc. 23 ¶¶ 5-6]  Mr. Montoya placed a food order with Plaintiff.  [Doc. 25 ¶ D]  While Plaintiff was talking to her mother on the Café telephone, Mr. Montoya pointed his Taser at Plaintiff's abdomen and "cycled" or "sparked" the Taser.  [Doc. 25 ¶ H; Doc.

3

23-4 p. 28] Mr. Montoya then went behind the counter where Plaintiff was standing, talking with her father on the Café telephone. [Doc. 23-4 p. 25; Doc. 25 ¶ F] He sat in a chair and pulled Plaintiff on to his lap. [Doc. 25 ¶ J; Doc. 25-2 p. 4; Doc. 23-4 p. 25-26] When Plaintiff got up, Mr. Montoya pulled her onto his lap a second time and grabbed her breasts. [Doc 25 ¶ L; Doc. 25-2 p. 4; Doc. 23-4 p. 26]

Plaintiff's mother entered the Café and saw Plaintiff, who "appeared frightened" sitting on Mr. Montoya's lap. [Doc. 25 ¶ N; Doc. 25-2 p. 4] Shortly thereafter, Mr. Montoya left the Café. [Doc. 25 ¶ N; Doc. 23-4 p. 27-28] After he left, Mr. Montoya sent Plaintiff a message via social media stating, "as much as you and your mother are mad at me you can't say anything because you are under age and they can take my job away from me." [Doc. 25 ¶ O; Doc. 25-1 p. 6]

As a result of Mr. Montoya's alleged behaviors in regard to Plaintiff, he was charged with the crimes of false imprisonment, aggravated assault, and battery. [Doc. 25-4 p. 1] He was arrested on April 9, 2015. [Doc. 23-2 ¶ 21] And on April 10, 2015, he was terminated from his employment with the Clayton Police Department. [Doc. 23-2 ¶ 23] As summarized in an affidavit by Scott Julian, the Chief of Police for the Town who is responsible for the day–to-day operation of the police department, including the officers' schedules, "[Mr.] Montoya had no work-related reason for using a police vehicle to drive to the Urrutia Café at any time before . . . 8 p.m. on [April 8, 2015], for entering that business while in uniform and while carrying his departmental Taser, or for cycling it[.]" [Doc. 23-2 ¶¶ 3, 22]

**DISCUSSION**

Under the New Mexico Tort Claims Act, governmental entities are not immune from liability for the torts of battery and false imprisonment committed "by law enforcement officers *while acting within the scope of their duties*." NMSA 1978, § 41-4-12 (1978) (emphasis added). The Town seeks summary judgment on the ground that Mr. Montoya was not acting within the scope of his duties when he allegedly committed these torts against Plaintiff. [Doc. 23 p. 2] For the reasons that follow, the Court concludes that the Town is entitled to summary judgment on this basis.

**Law Relating to the Scope of Duty Analysis**

As used in the New Mexico Tort Claims Act, "'scope of duty' means performing any duties that a public employee is requested, required[,] or authorized to perform by the governmental entity, regardless of the time and place of performance[.]" NMSA 1978, § 41-4-3(G) (2015). The focus is on the employee's *duty* as it relates to the at-issue act; the inquiry does not turn upon whether the act itself was requested, required, or authorized by the employer. *Risk Mgmt. Div. v. McBrayer*, 2000-NMCA-104, ¶¶ 19-20. Thus, a governmental entity may be liable for an employee's unauthorized tortious or criminal conduct, provided that there is some connection between the conduct and the duties that the employee was requested, required, or authorized to perform on behalf of the public entity. *Id.* ¶ 20.

In *McBrayer* the New Mexico Supreme Court held that a university instructor, who used the distribution of homework assignments as a ruse to lure a student to his apartment where he sexually assaulted, tortured, and tried to kill her could be found to

5

have been acting "within the scope of his duties." 2000-NMCA-104, ¶¶ 3-4, 20 (holding that the scope of duty issue was ultimately one for the fact-finder). While the tortious acts of the professor were obviously not requested, required, or authorized by the university, the court focused not on those *acts*, but, rather, on the professor's *duty* of distributing homework. *Id.* ¶¶ 19-20. Insofar as the professor used his duty of distributing homework to create the opportunity to accomplish his tortious conduct, the court held that a reasonable jury could find that those acts were "within scope of the duties that [the university] requested, required, or authorized [the professor] to perform." *Id.* ¶ 20.

Recently, this Court relied on *McBrayer* to conclude that a police officer with a duty of supervising a student during a ride-along was acting within the scope of his duty when he sexually assaulted the student. *D.G. v. The City of Las Cruces*, No. 2:14-cv-00368-MCA-WPL Doc. 206 at 11-17 (D.N.M. Feb. 1, 2016). This Court reasoned that insofar as the officer "was requested, required and authorized to supervise [the student] and maintain control of her" he "was acting within the scope of his duties as a matter of law" when, instead of returning the student to the police station, he drove her to an uninhabited neighborhood and committed the sexual assault. *Id.* at 15. Key to the Court's reasoning was that the officer had access to the student and the opportunity to assault her *because* the student was officially under his supervision. *Id.* This, the Court reasoned, established the requisite connection between the officer's duties and his tortious conduct toward the student. *Id.* at 15-16.

6

 **Analysis**

Plaintiff argues that *McBrayer* and *D.G.* "provide a polestar for resolution of the matter at hand." [Doc. 25 p. 11]  The Court agrees with Plaintiff that these cases guide the analysis of the circumstances of this case.  However, the Court does not agree with Plaintiff's argument that the reasoning in *McBrayer* and *D.G.*, as applied to this case leads to a conclusion that Mr. Montoya was acting within the scope of his duty when he committed the alleged torts.  As shown by *McBrayer*, and *D.G.*, the key determinant in the scope of duty analysis is whether public employee's requested, required, or authorized employment duties create the opportunity for the employee's tortious conduct.  The proffered facts in this case do not reveal any such connection.

Mr. Montoya went to the Urrutia Café when he was not on duty, and not "in-service."  His employer had not requested, required, or authorized him to conduct any police business related to the café, its staff, or specifically to Plaintiff.  He had no work-related reason for being there.

Furthermore, nothing in the scope of Mr. Montoya's duties bore any connection to Plaintiff or to the Urrutia Café.  Mr. Montoya's connection with Plaintiff stemmed not from his duties as a police officer, but from Plaintiff's personal friendship with Mr. Montoya.  And there is no evidence that Mr. Montoya used his duties as a police officer as a subterfuge or a ruse, as a way to gain access to Plaintiff, or as a means to cause Plaintiff to succumb to his actions.

That Mr. Montoya was wearing a police uniform, that he displayed and "cycled" his Taser, and that he drove his police car to the Urrutia Café do not establish the

7

requisite connection between the scope of his duties and his tortious conduct. The New Mexico Court of Appeals decision in *Narney v. Daniels*, 1992-NMCA-133 informs this conclusion. In *Narney*, a police officer who was off duty and outside of his jurisdiction used his department-issued badge and a gun to effect a traffic stop. *Id.* ¶¶ 2-3. The officer, who was under the influence of an acute psychotic episode, engaged in a variety of tortious conduct toward the inhabitants of the stopped vehicle. *Id.* ¶¶ 3-6. In affirming the trial court's holding that no reasonable trier of fact could conclude that the officer was acting "in the course and scope of his employment"[2] the appellate court relied on two pertinent facts. *Id.* ¶ 35. First, the court noted, the incident occurred on a day that the officer—having been advised by his superiors to "take a couple of days off"—was not on duty. *Id.* ¶ 20. Secondly, the incident occurred outside the limits of the city in which the officer was generally authorized to perform police duties. *Id.* ¶¶ 28, 35. In light of these facts, the court concluded, there was no "reasonabl[e] connect[ion]" between the officer's actions and the duties that he was authorized by his employer to perform. *Id.* ¶¶ 34-35.

Here, there is no connection between Mr. Montoya's police car, badge, or uniform and his conduct toward Plaintiff. The alleged torts occurred inside the café, Mr. Montoya's mode of transportation to the café and his attire were, in these circumstances, purely incidental. Mr. Montoya is alleged to have used his Taser in his tortious conduct

---

[2] When *Narney* was decided, New Mexico Courts had not yet parsed the common law concept of "course and scope of employment" and the Tort Claims Act concept of "scope of duty"; a fact that does not affect this Court's analysis of the present matter. *See id.* ¶ 28; *McBrayer*, 2000-NMCA-104, ¶9 (noting that courts in previous cases found it unnecessary to distinguish at the concept of "course and scope of employment" from that of "scope of duty").

toward Plaintiff. However, as shown in *Narney*, the mere use of police-issued equipment by an off-duty officer whose tortious actions bore no connection to his authorized duties does not render the public employer liable under the Tort Claims Act.

For the foregoing reasons, the Court concludes that the undisputed material facts do not demonstrate a genuine issue as to whether Mr. Montoya was acting within the scope of his duties when he allegedly committed the torts of false imprisonment and battery against Plaintiff. The Court concludes, as a matter of law, that there was no connection between Mr. Montoya's alleged tortious conduct and his duties as an officer of the Clayton Police Department. As such, the Court will grant the Town's *Motion for Summary Judgment*.

**CONCLUSION**

**WHEREFORE, IT IS HEREBY ORDERED** that *Defendant Town of Clayton's Motion for Summary Judgment* [Doc. 23] is **Granted**.

**IT IS SO ORDERED** this 19th day of September, 2016 in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
**Chief United States District Judge**